**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Robert Mossbruger, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VNSS LLC a/k/a Envious Real Estate, and Marie Nader Team LLC,<br><br>Defendants. | CASE NO.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## Nature of this Action

1. Robert Mossbruger ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against VNSS LLC a/k/a Envious Real Estate ("Envious") and Marie Nader Team LLC ("Nader Team") (together, "Defendants") under the Telephone Consumer Protection Act ("TCPA").

2. Upon information and belief, Defendants routinely violate 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2) by delivering more than one advertisement or marketing telephone call to residential telephone numbers registered with the National Do-Not-Call Registry ("DNC Registry") without the prior express invitation or permission required by the TCPA.

3. Also, upon information and belief, Defendants routinely violate 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d)(4) by delivering more than one advertisement or telemarketing message to residential or cellular telephone numbers while failing to identify "the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."

**Parties**

4. Robert Mossbruger is a natural person who at all relevant times resided in North Olmsted, Ohio.

5. Envious is an Ohio limited liability company that runs a lead generation and real estate business that is headquartered in Westlake, Ohio.

6. Nader Team is an Ohio limited liability company that runs a real estate business that is headquartered in Westlake, Ohio.

7. Nader Team employs a handful of real estate salespeople associated with the Howard Hanna brokerage, including, upon information and belief, the Ohio-licensed agents Natalina Nader (License No. SAL.2020004826) and MarieRose Jean Nader (License No. SAL.2002010084).

**Jurisdiction and Venue**

8. This Court has subject matter jurisdiction under 47 U.S.C. § 227(c)(5), and 28 U.S.C. § 1331.

9. Venue is proper before this Court under 28 U.S.C. § 1391(b)(1) and (b)(2) as Defendants (and Plaintiff) reside in this District, and a significant portion of the events giving rise to this action occurred in this District.

10. In particular, Defendants directed their communications from within this District to Plaintiff's telephone also located within this District, and Plaintiff received Defendant's communications in this District.

**Factual Allegations**

11. Robert Mossbruger is, and has been at all times relevant to this action, the regular and sole user of his cellular telephone number—(440) 668-XXXX.

12. Robert Mossbruger uses his cellular telephone as his personal residential telephone number.

13. In 2003, the Federal Communications Commission ("FCC") ruled that cellular telephone numbers that are placed on the DNC registry are presumed to be residential. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003).

14. Robert Mossbruger registered his cellular telephone number with the DNC Registry on April 5, 2018, and has maintained that registration through the present date.

15. Beginning in early 2026, Robert Mossbruger started receiving numerous telephone voice calls, voicemail messages, and text messages from (844) 493-6746 and (440) 587-0281:






16. On at least one occasion, Plaintiff answered a call from (440) 587-0281, and the caller stated that they were calling from "NVSS Real Estate."

17. Upon information and belief, the "Lina" who sent Plaintiff a text message is Natalina Nader, based on "Lina" being a common nickname for Natalina.

18. In that call, Plaintiff asked for the website of the caller to verify their identity, and in response, they hung up.

19. Each of the voicemails from (440) 587-0281 play only static.

20. Plaintiff did not recognize the caller, was not selling his home, and was not looking to sell his home.

21. Upon information and belief, Envious placed the above-referenced telephone voice calls, voicemails, and text messages.

22. Plaintiff received at least nine voicemail messages from Envious based on at least nine telephone voice calls placed to Plaintiff; however, and, because of the frequency and number of calls, he believes that he has received additional voice calls from Envious.

23. Envious goes by a litany of similar names, including "NVSS," "NVSS Homes," "NVSS Real Estate," "NVSS Envious Real Estate," and "Envious Real Estate", and it appears to operate two websites, www.nvssrealestate.com, and www.nvsshomes.com, each with identical logos, both purporting to be real estate businesses, and both websites using the above names interchangeably.[1]

24. The www.nvssrealestate.com discloses that it is owned and operated by Envious.

25. The www.nvsshomes.com website discloses a contact email address of natnader1@gmail.com, which, upon information and belief, belongs to Natalina Nader.

26. Envious purports to be "a locally owned business provide compassionate and transparent solutions to homeowners."[2]

27. Through its communications to Plaintiff, Envious sought to engage Plaintiff to use Envious in the sale of his home.

28. On its websites, Envious instead suggests that it seeks to purchase homes from consumers it contacts, with a seeming focus on distressed properties or homeowners: "Whatever your circumstances may be – be it foreclosure, ownership of a challenging property, probate, or any other challenge – we've got you covered. At our company, we specialize in crafting win-win solutions, ensuring that you can move forward with confidence."[3]

29. However, rather than purchase properties directly, Envious, instead, seeks to solicit homeowners to permit Envious to market their properties to third party investors to acquire, or to real estate brokers for conventional real estate representation.

---

[1] *See generally* https://nvssrealestate.com/ (last visited July 24, 2026); https://nvsshomes.com/ (last visited July 24, 2026).

[2] https://nvsshomes.com/contact/ (last visited July 24, 2026).

[3] https://nvsshomes.com/about/ (last visited July 24, 2026).

30. Upon information and belief, even for the properties Envious represents that it will "purchase," Envious does not actually purchase the property, as it purports it would in its marketing materials.

31. Rather, Envious seeks to identify consumers who might be interested in selling a home, and then, once that consumer expresses willingness to transact with Envious, Envious places a non-binding offer on the property, and then remarkets the contract to purchase the property to third party investors without ever taking possession or title of the property.

32. In doing so, if an interested purchaser emerges, Envious then seeks to assign the purchase agreement to that investor, in exchange for a hefty fee that would be deducted from the fair market value of the property sold, and instead paid to Envious via an assignment fee.

33. Furthermore, in the event that Envious fails to successfully remarket the property to third party investors, it instead reneges on the purchase agreement.

34. For the interactions or transactions in which Envious does not arrange for conventional real estate representation, Envious enters into illusory purchase agreements that are only consummated if Envious is able to successfully remarket the property to a third-party investor, in exchange for a fee paid to Envious.

35. In other words, Envious does not purchase, nor seek to purchase, anything, rather, it attempts to sell a contract for a property to third-party investors for a profit.

36. Therefore, upon information and belief, Envious is a real estate wholesaler, which is a strategy in which a wholesaler seeks to (1) persuade a homeowner to sell their home to the wholesaler at a substantial discount below fair market value, in exchange for a suite of services to ease the sale, then (2) prior to completing the purchase, remarket the property to third-party purchasers or investors, to (3) assign or sell the contract to that investor for a substantial premium,

thereby allowing the investor to step into Envious's shoes and acquire the house instead, with the difference in price solely allocated to Envious as profit, instead of the homeowner.

37. This conduct is precisely the subject of the recently enacted ORC Ann. 5301.95 that regulates wholesalers and mandates disclosures, including that "A wholesaler is acting on the wholesaler's own behalf and does not represent the owner in this transaction. A wholesaler enters assignable contracts with owners and seeks to sell or assign the wholesaler's interest for a profit. The wholesaler may assign the wholesaler's interest in the purchase contract to a third party without the owner's consent before closing. The wholesaler may charge a fee to the third-party buyer separately for profit. The agreed purchase price between the owner and wholesaler may be below market value and is conveyed voluntarily."

38. As Senator Andrew O. Brenner explained:

> . . . problems arise when wholesalers engage in aggressive tactics to persuade homeowners to enter into such a contract. He said that wholesalers mislead homeowners into believing that the wholesaler is the one purchasing the property when, in reality, the wholesaler intends to sell the contract for a profit. If the wholesaler cannot find an investor to sell the contract to, Senator Brenner explained that the wholesaler will back out of the contract without closing, with few consequences.
>
> If the closing proceeds, he testified that the homeowner then discovers that the actual purchaser is a third-party investor with whom the homeowner has never interacted. He also asserted that the homeowner finds that the sale price is well below fair market value, benefitting the wholesaler who makes a profit while depriving the homeowner of equity in the home.5F[4]

39. For example, Envious advertises property offerings on numerous investor groups

---

[4] https://www.legislature.ohio.gov//download?key=22901 (last visited July 17, 2026) (the Ohio Legislative Service Commission's Occupational Regulation Report for this bill, discussing wholesaling generally, including the bill's primary sponsor, Senator Andrew O. Brenner's testimony that the "Department of Commerce's Division of Real Estate and Professional Licensing has received reports of a concerning increase in wholesaling activity that involves predatory contracts, misleading sales tactics, clouding title to properties, and targeting susceptible homeowners.").

and platforms:[5]







5 *See, e.g.*, https://www.facebook.com/groups/360658935369749/posts/1484975639604734/ (last visited July 24, 2026); https://www.facebook.com/groups/realestatewestvirginia/posts/653305760819267/ (last visited July 24, 2026); https://www.facebook.com/groups/981294799998732/posts/1142153843912826/ (last visited July 24, 2026); https://www.facebook.com/groups/clevelandrei/posts/667749549102613/ (last visited July 24, 2026).


West Virginia Real Estate Investing Charleston Huntington Morgantown · Join
NVSS Real Estate · August 20, 2025 ·

Who's looking to buy a distressed property here? $25k negotiable. Dunbar, WV.

4

Most relevant

Gunnar North · 47w
Me
Reply Share

Thomas Hoard II · 47w
Information?
Reply Share

NVSS Real Estate · 46w
Our property in Dunbar, WV is still available, call me or shoot me a message (216) 800-6932 if you are still interested. I can provide more info.
Reply Share


Ohio Real Estate networking · Join
Matthew Koche · October 1, 2025 ·

I'm a flipper local to cleveland! We're looking to close on 2 to 3 flips a month! If you're a wholesaler investor friendly realtor, reach out to me with your deals! Here's my buy box:

ARV 150 - 300k

Rehab: anything other than foundation issues

Areas: anything within a 1 hour drive from cleveland! We especially love the smaller suburbs, so before y'all wholesalers try to novate send me a DM!

4 7

Newest

Bugz Bennett · 41w
Anyone buying houses to fix up HIM LLC can help!
Reply Share

Lisa Marie · 41w
Price is negotiable
HOME FOR SALE
Reply Share

Brittany Minocchi · 41w
If you ever have a buy and hold you want to refi to pull cash based on the appraised value, let me know - I can go up to 75% LTV with no seasoning as long as the property was rehabbed.
Reply Share

NVSS Real Estate · 41w · Follow
Can't DM you, but here's my number text/call me (216) 800-6932. I have one in Youngstown, fit for flippers.

40. In order to persuade a consumer to transact with Envious —or one of its affiliate partners—in exchange for a below-fair market value offer on their home, Envious offers to take

care of all aspects of the transaction.

41. Envious therefore necessarily offers to pair numerous services offered by a real estate agent—appraising the fair market value of the property, arranging for title and escrow services, preparing and completing purchase paperwork, and connecting the homeowner with third-party buyers—with its communications to Plaintiff.[6]

42. In fact, Envious offers even more services than a traditional real estate agent, such as taking care of packing or moving for a homeowner:[7]

Are you worried about moving your belongings?

We will help so you wont have to pay thousands for a moving company.

Have you notfound your next home yet?

We have so much inventory all over ohio, we most likely have the home you are looking for! we will give you time to move we want to make this process as stress free as possible!

Is there any commitment when I submit my information?

What if I have too many belongings?

You may leave everything you dont want in the property we will take care of it. We will help you move your belongings by providing a truck and man power.

43. All the while, Envious states that it is "dedicated to providing sellers across the

---

[6] *See, e.g.*, https://www.liveabout.com/what-real-estate-agents-do-2866370 (last visited July 17, 2026) (noting that real estate agents assist home sellers by, among other things, "[d]etermin[ing[ the home's value in the current market"; "[c]oordinat[ing] the process from signing the contract to closing the deal, including scheduling inspections, preparing documents and other items necessary to close"; and "help[ing] the seller to try to get the price they want and to obtain a signed purchase agreement.").

[7] https://nvsshomes.com/faq/ (last visited July 17, 2026)

country with the best and most stress-free service" in the sale of their homes.[8]

44. As another example, through a job posting for a "Real Estate Acquisitions Representative," Envious described the position to include the following responsibilities:[9]

- "Our Sales Acquisition Representatives work directly with distressed sellers—people who need to sell their homes quickly. The goal is to engage with these sellers, build rapport, and consistently get properties under contract by following our proven sales script,"
- "Build rapport with prospects and clients to overcome objections and get the deal signed,"
- "Assess comparables, property value, and condition through research, outreach, data, site walks, and market trends,"
- "Conduct outbound and inbound sales calls to property owners,"
- "Build trust and rapport with sellers to uncover their needs and motivations," and
- "Negotiate and structure property purchase agreements."

45. Upon information and belief, Envious seeks to supplant the role of a traditional real estate agent while providing the same services as a real estate agent, and in exchange for doing so, is compensated by obtaining a homeowner's property at a reduced price, and thereafter selling it at an inflated price.

46. Upon information and good faith belief, in exchange for providing these services, Envious seeks to pay—or find third party investors to pay—substantially below fair market value for the homes it seeks to purchase.

---

8 https://nvssrealestate.com/ (last visited July 20, 2026).

9 https://www.wayup.com/i-j-Real-Estate-Acquisitions-Representative-NVSS-Envious-Real-Estate-7754441095914/ (last visited July 20, 2026).

47. As a result, Envious would be (and, upon belief and information, is) compensated for its services in an analogous manner to a real estate agent: after providing services to facilitate the transaction, receiving compensation from the proceeds related to the buying or selling of a home.

48. The FCC's guidance is particularly illuminating here. Congress charged the FCC with implementing the Federal Do-Not-Call rules. 47 U.S.C. § 227(c)(1). In 2005, the National Association of Realtors petitioned the FCC for an exemption from the Do-Not-Call rules' definition of "solicitation" for calls made by real estate agents to property owners with lapsed real estate listings, where the real estate agent solicits their services to a prospective seller. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788 (2005). In interpreting the definition of "telephone solicitation," the FCC rejected this proposed exemption, and concluded "that a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." *Id.* at 3793-94.

49. In other words, the FCC has expressly declared that conduct materially similar to Envious's conduct qualifies as a regulated telephone solicitation which accordingly means that Envious must adhere to both 1) the DNC Registry; and 2) the requirement that a telemarketer obtain prior express written consent before sending any telemarketing or solicitation messages.

50. Critical, then, is that Envious appears to also work in conjunction with several Nader Team real estate agents: Natalina Nader, MarieRose Jean Nader, and possibly others.

51. Envious's operations appear to be owned and operated, at least in part, by the Nader Team, and for the benefit of the Nader Team.

52. Natalina Nader's personal contact information is provided on Envious's website,

and the phone number disclosed on the website, (216) 704-9147, connects to a Caller Identification stating "Natalina Nader, Howard Hanna."

53. Moreover, in multiple of its posts seeking to assign or sell properties it attempts to acquire, Envious provides the phone number (216) 800-6932, which is used by MarieRose Jean Nader in her professional capacity as a Howard Hanna agent for the Nader Team.[10]

54. Natalina Nader cross-promotes her position as both a Howard Hanna and Nader Team agent *and* owner of Envious:[11]




55. Moreover, Natalina Nader was promoted as a real estate "all star" as a Howard Hanna agent, touting her operation of Envious.[12]

56. Similarly, MarieRose Jean Nader touts her status as a real estate wholesaler with her husband, Hani Nader—who is also a Nader Team agent, with License No. SAL.2002010163—who describes their operation in an interview as: "We find the property, whether it's at a foreclosure auction or distressed property from a bank, we would contact the right investor for that

---

[10] *See, e.g.*, https://www.mystatemls.com/profiles/oh/painesville/smythe-cramer-co/marierose-nader/524379/ (last visited July 20, 2026).

[11] https://www.instagram.com/natalina.nader/ (last visited July 20, 2026).

[12] https://www.facebook.com/photo?fbid=556144256798754&set=pcb.556145326798647 (last visited July 24, 2026).

particular property," with the interviewer noting that "they're not selling all the homes to just anyone, they're finding them for investors" and that "[t]hose investors, then flip the homes with their own money but the Nader's mentorship."[13]

57. Moreover, that article acknowledges and touts the Nader family status as Howard Hanna agents:

**'The Face of Lakewood': How one woman has transformed Lakewood by buying, flipping, and selling dozens of homes**




Howard Hanna Real Estate Agent Marie Nader is on signs throughout dozens of home in the city and she is dominating the city with her talents

58. As a result, the Nader Team had abundant knowledge and notice of its agents' real estate wholesaling conduct, and while using the Howard Hanna and Nader Team name and resources to conduct the operations of Envious.

59. Upon information and belief, Envious obtained Plaintiff's contact information through the use of targeted address searches to identify corresponding homeowner names, and then skip-tracing or cross-referenced those names against phone numbers associated with those

---

13 https://www.news5cleveland.com/news/originals/the-face-of-lakewood-how-one-woman-has-transformed-lakewood-by-buying-flipping-and-selling-dozens-of-homes (last visited July 20, 2026).

homeowner names, all the while not scrubbing those phone numbers against the DNC Registry.

60. For at least some of the listings Natalina Nader purports to sell on behalf of Envious, the listing was actually made by MarieRose Jean Nader or Hani Nader in their capacity as Nader Team salespersons.

61. For example, Natalina Nader's real estate Instagram page promotes her status as "Owner of Envious Real Estate" and proceeds to post listings such as the following:[14]




62. However, that property was listed by "MarieRose J Nader marienader@howardhanna.com[,] 216-407-1974, Howard Hanna, Hani M Nader 216-337-1976, Howard Hanna."[15]

63. Moreover, Envious represents that it seeks to also speak to those who "are not

---

[14] https://www.instagram.com/stories/highlights/17956759835145557/ (last visited July 20, 2026).

[15] https://www.zillow.com/homedetails/8340-Brecksville-Rd-Brecksville-OH-44141/33618579_zpid/ (last visited July 20, 2026).

interested in selling", which, upon information and belief, is an attempt to invite persons to contact Envious so that Defendants can offer those persons conventional real estate representation through Nader Team.[16]

64. Therefore, upon information and belief, Envious funnels some of its leads to conventional real estate representation by Nader Team's licensed agents.

65. Given the inherent overlaps between Envious and Nader Team, including common ownership and management, shared usage of the same telephone number, familial ties, and sharing of listings and leads, both Envious and Nader Team profit, or stand to profit, off of Envious's telemarketing efforts.

66. Plaintiff did not give Defendants prior express consent or prior express written consent to place telephone calls to his telephone number.

67. The telephone calls at issue were sent for non-emergency purposes.

68. Upon information and good faith belief, the telephone calls at issue were placed by Defendants voluntarily.

69. The purpose of the telephone calls at issue was to advertise and to market Defendants' business or services.

70. Plaintiff did not give Defendants prior express invitation or permission to place advertisement or marketing telephone calls to his telephone number.

71. Defendants knew, or should have known, that they and their employees were, and are, engaging in prohibited telemarketing conduct by delivering solicitation calls, absent prior express written consent, to consumers who registered their telephone numbers on the DNC Registry.

---

[16] https://nvsshomes.com/about/ (last visited July 24, 2026).

72. Defendants knew, or should have known, that they were generating or accepting leads that were obtained in violation of the TCPA, and proceeded to accept the benefits of those unlawful leads anyway.

73. As a result, Defendants are either directly liable for placing the telephone calls at issue, or in the alternative, the Nader Team is liable for its various agents acting as Envious by placing, or causing to be placed, the telephone calls at issue on a theory of actual authority, implied authority, or ratification, given that the calls were sent by multiple of Nader Team's agents, Nader Team had notice that the specific agents at issue openly engaged in real estate wholesaling and therefore engaged in similar telemarketing conduct in violation of the TCPA, and Nader Team nevertheless continued to accept the benefits of its agents' conduct.

74. Plaintiff suffered actual harm as a result of the telephone calls at issue in that he suffered an invasion of privacy, an intrusion into his life, and a private nuisance.

75. Upon information and good faith belief, Defendants knew, or should have known, that Plaintiff registered his telephone number with the DNC Registry.

## Class Action Allegations

76. Plaintiff brings this action under Federal Rule of Civil Procedure 23, and as a representative of the following class (the "Classes"):

**Federal Do-Not-Call Registry Class:**

> All persons throughout the United States (1) to whom VNSS LLC or Marie Nader Team LLC placed, or caused to be placed, more than one telephone call within a 12-month period, promoting the goods or services of "NVSS," "NVSS Homes," "NVSS Real Estate," "NVSS Envious Real Estate," or "Envious Real Estate," (2) where the person's residential telephone number had been registered with the National Do Not Call Registry for at least thirty days before VNSS LLC or Marie Nader Team LLC placed, or caused to be placed, at least two of the telephone calls within the 12-month period, (3) within four years preceding the date of this complaint through the date of class certification.

**Sender Identification Class:**

> All persons and entities throughout the United States (1) to whom VNSS LLC or Marie Nader Team LLC placed, or caused to be placed, more than one call within a 12-month period, promoting the goods or services of "NVSS," "NVSS Homes," "NVSS Real Estate," "NVSS Envious Real Estate," or "Envious Real Estate," (2) where the subject calls did not state the name of the individual caller, the name of VNSS LLC or Marie Nader Team LLC, and a telephone number or address at which VNSS LLC or Marie Nader Team LLC may be contacted, (3) within four years preceding the date of this complaint through the date of class certification.

77. Excluded from the Classes are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

78. Upon information and belief, the members of the Classes are so numerous that joinder of all of them is impracticable.

79. The exact number of members of the Classes are unknown to Plaintiff at this time, and can be determined only through appropriate discovery.

80. The members of the Classes are ascertainable because the Classes are defined by reference to objective criteria.

81. In addition, the members of the Classes are identifiable in that, upon information and belief, their telephone numbers, names, and addresses can be identified in business records maintained by Defendant, and by third parties, including members of the Classes.

82. Plaintiff's claims are typical of the claims of the members of the Classes.

83. As it did for all members of the Federal Do-Not-Call Registry Class, Defendants, or their employee agents or salespersons, placed solicitation telephone calls to Plaintiff's telephone number more than thirty days after Plaintiff registered his telephone number with the DNC Registry.

84. As it did for all members of the Sender Identification Class, Defendants, or their

employee agents or salespersons, delivered solicitation telephone calls to Plaintiff's telephone number where the subject telephone calls did not state the name of the individual caller, the name of Defendants, and a telephone number or address at which Defendants may be contacted.

85. Plaintiff's claims, and the claims of the members of the Classes, originate from the same conduct, practice, and procedure on the part of Defendants.

86. Plaintiff's claims are based on the same theories as are the claims of the members of the Classes.

87. Plaintiff suffered the same injuries as the members of the Classes.

88. Plaintiff will fairly and adequately protect the interests of the members of the Classes.

89. Plaintiff's interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the Classes.

90. Plaintiff will vigorously pursue the claims of the members of the Classes.

91. Plaintiff has retained counsel experienced and competent in class action litigation.

92. Plaintiff's counsel will vigorously pursue this matter.

93. Plaintiff's counsel will assert, protect, and otherwise represent the members of the Classes.

94. The questions of law and fact common to the members of the Classes predominate over questions that may affect individual members of the Classes.

95. Issues of law and fact common to all members of the Classes include:

a. Defendants' conduct, pattern, and practices as it pertains to placing advertisement and telemarketing telephone calls;

b. For the Federal Do-Not-Call Registry Class, Defendants' practice of placing

telephone calls, for solicitation purposes, to telephone numbers already registered on the DNC Registry for more than thirty days;

c. For the Sender Identification Class, Defendants' practice of placing telephone calls, for solicitation purposes, without identifying the name of the individual caller, the name of Defendants, and a telephone number or address at which "NVSS," "NVSS Homes," "NVSS Real Estate," "NVSS Envious Real Estate," or "Envious Real Estate," may be contacted;

d. Whether Nader Team is liable for the actions of Envious, under either a direct liability or agency liability theory;

e. Defendants' violations of the TCPA; and

f. The availability of statutory penalties.

96. A class action is superior to all other available methods for the fair and efficient adjudication of this matter.

97. If brought and prosecuted individually, the claims of the members of the Classes would require proof of the same material and substantive facts.

98. The pursuit of separate actions by individual members of the Classes would, as a practical matter, be dispositive of the interests of other members of the Classes, and could substantially impair or impede their ability to protect their interests.

99. The pursuit of separate actions by individual members of the Classes could create a risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendants.

100. These varying adjudications and incompatible standards of conduct, in connection with presentation of the same essential facts, proof, and legal theories, could also create and allow

the existence of inconsistent and incompatible rights within the Classes.

101. The damages suffered by the individual member of the Classes may be relatively small, thus, the expense and burden to litigate each of their claims individually make it difficult for the members of the Classes to redress the wrongs done to them.

102. The pursuit of Plaintiff's claims, and the claims of the members of the Classes, in one forum will achieve efficiency and promote judicial economy.

103. There will be no extraordinary difficulty in the management of this action as a class action.

104. Defendants acted or refused to act on grounds generally applicable to the members of the Classes, making final declaratory or injunctive relief appropriate.

**Count I**
**Violation of 47 U.S.C. § 227(c)(5)**
**On behalf of the Federal Do-Not-Call Registry Class**

105. Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1-104.

106. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

107. Section 64.1200(e) provides that §§ 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."

108. Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this

subsection may" may bring a private action based on a violation of those regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c).

109. Defendants violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff and the Federal Do-Not-Call Registry Class who registered their respective residential telephone numbers with the DNC Registry, which is a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

110. Defendants violated 47 U.S.C. § 227(c)(5) because they delivered, or caused to be delivered, to Plaintiff and the Federal Do-Not-Call Registry Class, more than one solicitation telephone call in a 12-month period in violation of 47 C.F.R. § 64.1200.

111. In the alternative, Envious violated 47 U.S.C. § 227(c)(5) by delivering more than one solicitation call in a 12-month period to Plaintiff's cellular telephone number without prior express written consent, and Nader Team is liable for Envious's violations because (1) it ratified their conduct by either accepting leads and commission revenue generated by their telemarketing campaign, and agreeing to share revenue with those salespersons that arose out of that telemarketing campaign, and promoting, and supporting their realty business as Howard Hanna-licensed agents formally affiliated with Envious; or (2) Envious acted with actual or apparent authority on behalf of Nader Team in telemarketing to consumers without obtaining prior express written consent.

112. As a result of Defendants' violations of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200, Plaintiff, and the members of the Federal Do-Not-Call Registry Class, are entitled to damages in an amount to be proven at trial.

**Count II**
**Violation of 47 U.S.C. § 227(c)(5)**
**On behalf of the Sender Identification Class**

113. Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1-104.

114. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(d), provides in relevant part that "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted." *Id.* at § 64.1200(d)(4).

115. Section 64.1200(e) provides that §§ 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."

116. Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may bring a private action based on a violation of those regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c).

117. Defendants violated 47 C.F.R. § 64.1200(d)(4) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff and the class members while failing to "provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."

118. Defendants therefore violated 47 U.S.C. § 227(c)(5) because they delivered, or caused to be delivered, to Plaintiff and members of the Sender Identification Class, more than one solicitation call in a 12-month period in violation of 47 C.F.R. § 64.1200(d)(4).

119. In the alternative, Envious violated 47 U.S.C. § 227(c)(5) by delivering more than one solicitation call in a 12-month period to Plaintiff's cellular telephone number without prior express written consent and without making required identifying disclosures, and Nader Team is liable for the real estate salespersons who comprise Envious's violations because (1) it ratified their conduct by either accepting leads and commission revenue generated by their telemarketing campaign, and agreeing to share revenue with those salespersons that arose out of that telemarketing campaign, and promoting, and supporting their realty business as Howard Hanna-licensed agents formally affiliated with Envious; or (2) Envious acted with actual or apparent authority on behalf of Nader Team in telemarketing to consumers without obtaining prior express written consent.

120. As a result of Defendants' violations of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200, Plaintiff, and the members of the Sender Identification Class, are entitled to damages in an amount to be proven at trial.

**Prayer for Relief**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action;

b. Designating Plaintiff as class representative of the proposed Classes under Federal Rule of Civil Procedure 23;

c. Designating Plaintiff's counsel as class counsel under Federal Rule of Civil Procedure 23;

d. Adjudging and declaring that Defendants violated 47 U.S.C. § 227(c)(5);

e. Enjoining Defendants from continuing their violative behavior, including continuing to deliver solicitation telephone calls to telephone numbers registered with the DNC Registry for at least thirty days absent prior express written consent;

f. Awarding Plaintiff and the members of the Classes damages under 47 U.S.C. § 227(c)(5)(B);

g. Awarding Plaintiff and the members of the Classes treble damages under 47 U.S.C. § 227(c)(5)(C);

h. Awarding Plaintiff and the members of the Classes reasonable attorneys' fees, costs, and expenses under Rule 23 of the Federal Rules of Civil Procedure;

i. Awarding Plaintiff and the members of the Classes any pre-judgment and post-judgment interest as may be allowed under the law; and

j. Awarding such other and further relief as the Court may deem just and proper.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all triable issues.

Date: July 27, 2026.

*/s/ Alex D. Kruzyk*
Alex D. Kruzyk* (to seek admission *pro hac vice*)
Bryan A. Giribaldo* (to seek admission *pro hac vice*)
**PARDELL, KRUZYK & GIRIBALDO, PLLC**
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
Tele: (561) 726-8444
akruzyk@pkglegal.com

bgiribaldo@pkglegal.com

*Counsel for Plaintiff and the proposed classes*